## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KA'LAH (KALAH) MARTIN,       )
                              )
           Plaintiff,      )
                              )
           v.                )      1:21CV906
                              )
GREGORY SEABOLT, et. al.,      )
                              )
           Defendants.     )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Defendants' Motion for Summary Judgment (Docket Entry 30; see also Docket Entry 31 (Supporting Memorandum) (collectively, the "Summary Judgment Motion")). For the reasons that follow, the Court will grant in part and deny in part the Summary Judgment Motion.[1]

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Ka'Lah Martin (the "Plaintiff"), commenced this action against several Defendants for alleged civil rights violations arising out of a traffic stop and arrest of Plaintiff on February 28, 2019. (See Docket Entry 1 (the "Complaint") at 1-39.) Plaintiff thereafter moved to amend her Complaint (Docket Entry 23; see also Docket Entry 23-1 (the "Amended Complaint")), which the Court granted in part (Text Order dated June 21, 2022). After the close of discovery, Defendants

---

1 Pursuant to 28 U.S.C. § 636(c), on consent of the parties, the undersigned United States Magistrate Judge conducts all proceedings in this case. (See Docket Entry 15 at 1.)

moved for summary judgment as to all claims. (See Docket Entry 30.) Plaintiff responded (Docket Entry 33 (the "Response")) and Defendants replied (Docket Entry 34 (the "Reply")).

According to the Amended Complaint, Defendants (officers with the Randolph County, North Carolina Sheriff's Office) unlawfully arrested Plaintiff on February 28, 2019, for a traffic infraction. (See Docket Entry 23-1 at 11, 13-14, 21-22.) In conducting that arrest, Plaintiff contends four of the Defendants employed excessive force by breaking the windows on Plaintiff's vehicle and extracting her from the vehicle through one of the broken windows. (See id. at 13-14, 22-25.) Other Defendants, allegedly present at the scene, failed to intervene and prevent the unlawful arrest or use of force. (See id. at 30-32.) Thereafter, the Complaint asserts that Defendants denied Plaintiff medical treatment, while she remained in police custody, for injuries stemming from the arrest. (See id. at 25-26.) The Complaint attributes the alleged foregoing constitutional violations to a failure to train officers (and a propensity to hire troublesome ones) by Defendant Seabolt, Sheriff of Randolph County. (See id. at 18-19, 26-29.) The Complaint also alleges a series of state law torts arising from this incident. (See id. at 32-37.) As a consequence, the Complaint seeks compensatory damages for Plaintiff's physical and emotional injuries, as well as punitive damages and attorney's fees. (See id. at 2-3, 38.)

2

The record reflects that Plaintiff drove a Toyota sedan on February 28, 2019. (See Docket Entry 31-1 at 9 (Plaintiff's deposition testimony that she drove "a bluish, greenish Toyota").)[2] Plaintiff previously purchased the vehicle for $600 (see id. at 28; see also id. at 10 (Plaintiff describing vehicle as "a hooptie")), and the vehicle had some issues, i.e., the driver side door and window did not open, and neither did the front passenger side door or window (see id. at 35). The left rear passenger door and window also did not work (see Docket Entry 23-2 at 2); thus, to operate the vehicle, Plaintiff had to enter through the right rear passenger door, then climb between the two front seats into the driver seat (see id.; see also Docket Entry 31-1 at 35-36).

During the day on February 28, law enforcement officers in Montgomery County, North Carolina pulled Plaintiff over and confiscated her license plate due to the belief Plaintiff lacked motor vehicle insurance. (See Docket Entry 31-1 at 8.) Thereafter, Plaintiff continued to drive. (See id. at 29 (deposition testimony from Plaintiff that "[she was] just trying to get to work").) That same evening, at approximately 6:38pm, Defendant Short (with the Randolph County Sheriff's Office)

---

2 For consistency, pin cites to all exhibits will refer to the pagination of the PDF, rather than any pagination in the exhibit, such as the deposition transcript referenced here.

3

attempted to conduct a traffic stop of Plaintiff for failure to display a registration plate. (See Docket Entry 23-2 at 5.)[3]

According to Plaintiff, when Defendant Short attempted the traffic stop, Plaintiff initially did not pull over due to construction on the shoulder of the highway. (See Docket Entry 31-1 at 26-27.) Plaintiff, instead, slowed her vehicle from 65 miles-

---

3 In the Reply, Defendants contend that the Court may not consider, for purposes of summary judgment, "the incident reports" (Docket Entry 34 at 4) attached to the Amended Complaint because (1) the report's contents constitute hearsay (see id.), and (2) the incident reports "were [not] . . . authenticated" (id.). Neither argument persuades the Court. First, the incident reports, authored by individual Defendants to this action and primarily containing their observations from the evening of February 28, do not constitute hearsay when offered by Plaintiff. See Fed. R. Evid. 801(d)(2) (excluding statements of party opponents from definition of hearsay). Further, Defendants' argument with regard to authentication conflates veracity with authenticity. (See Docket Entry 34 at 5 (arguing that "Plaintiff never asked the deputy Defendants about their involvement in her allegations, nor did Plaintiff seek confirmation of the information in, and the authorship, accuracy, and authenticity of, the incident reports she attached to her pleadings"). "To satisfy the burden of authentication under Fed. R. Evid. 901(a), a proponent need only present 'evidence sufficient to support a finding that the matter in question is what the proponent claims.'" United States v. Pantic, 308 F. App'x 731, 733 (4th Cir. 2009) (citing Fed. R. Evid. 901(a)). "The proponent's burden of authentication is slight-only a prima facie showing is required." Id. Here, Defendants' counsel sent the incident reports to Plaintiff's counsel (see Docket Entry 23-2 at 1), and identified them as such (see id.). Accordingly, Plaintiff has "present[ed] evidence sufficient to support a finding that the [incident reports are] what [Plaintiff] claims." Pantic, 308 F. App'x at 733 (internal quotation mark omitted). As a result, the Court will consider these incident reports for purposes of ruling on the Summary Judgment Motion. See Fed. R. Civ. P. 56(c)(1)(A); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (emphasizing that "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves").

per-hour to approximately 30 miles-per-hour (see id. at 25) and
turned on her vehicle's hazard lights (see id. at 49). Citing the
fact that "[i]t was dark" (id. at 22) and that the rain "was
pouring down" (id.), Plaintiff maintained she inadvertently passed
two exits on the highway (see id. at 21; see also id. at 22
(Plaintiff's testimony that she passed two exits because "[she]
could barely see a thing" and "didn't see [the second exit] until
[she] passed it")). As Plaintiff continued along the highway,
Defendant Short advised other officers over his radio "that he was
pursuing a vehicle" (Docket Entry 23-2 at 3; see also id. at 7
(incident report reflecting that Defendant "Short . . . was in a
low speed chase"), 11 (Defendant Short's incident report stating
that Plaintiff "dr[ove] a total of 5.7 miles after [Defendant
Short] initiated [his] patrol car's emergency li[ghts]")), and
other officers, including Defendants Gabby, Weaver, Harrelson, Cox,
and Slafky, responded by positioning their vehicles at the next
exit on the highway (after the two exits Plaintiff had passed by
that point), the McDowell Road exit (see id. at 3-5, 7-8).

Plaintiff eventually exited the highway towards McDowell Road,
then pulled over on the exit ramp. (See Docket Entry 31-1 at 26.)
After Plaintiff's vehicle came to a stop, Defendants Short, Weaver,
Gabby, and Harrelson approached the vehicle with their guns drawn.
(See id. at 30 (Plaintiff recalling that, as soon as she pulled
over, she "saw a whole bunch of deputies just running, just huffing

5

and puffing and running and guns drawn"); see also Docket Entry 23-2 at 3-5 (incident reports reflecting that Defendants approached Plaintiff's vehicle with duty weapons drawn).) Defendants Short, Weaver, and Gabby approached the driver side door (see Docket Entry 23-2 at 3, 5); Defendant Harrelson approached the front passenger side door (see id. at 5). Defendants Short, Weaver, and Gabby ordered Plaintiff to show her hands and exit the vehicle (see id. at 3-5), to which Plaintiff replied that she could not open the driver side door or roll the window down (see Docket Entry 31-1 at 34).

The record contains conflicting evidence as to whether Plaintiff kept her hands in view of Defendants. (Compare Docket Entry 23-2 at 4 (Defendant Harrelson's incident report reflecting that "De[fendant] Short was giving commands to the driver to show her hands, and the driver was not complying"), 5 (noting that Plaintiff's "hands were at her waist w[h]ere [Defendant Harrelson] could not see them"), with Docket Entry 31-1 at 31 (Plaintiff's testimony that she "had [her hands] pressed up against the [window]" so that the officers "don't see [Plaintiff] reaching for nothing or none of that").) The record does reflect, though, that at least some Defendants could hear Plaintiff communicate that she could not open her car door or window. (See Docket Entry 23-2 at 5 (Defendant Harrelson, who approached the vehicle on the passenger side, reporting that "De[fendant] Short was giving the driver []

commands to open the car door and she stated she could not do so"); Docket Entry 31-1 at 34-35 (Plaintiff recounting that, after officer standing on driver side of her vehicle told her to "open the door" and she said "[she] can't," that officer then said "well, cover your face [because] I'm busting your window now"), 36 (recalling: "[The officer] heard me. . . . We was [sic] talking through the window.").)

After Defendants Short and Weaver unsuccessfully tried to open Plaintiff's driver side door from the outside, "they busted out the driver's side window." (Docket Entry 23-2 at 6; <u>see also</u> <u>id.</u> at 3 (Defendant Gabby reporting that Defendants Short and Weaver "were attempting to gain access to the vehicle from the driver's door unsuccessfully," and that "[w]hile [Defendant Gabby's] attention was on the driver [he] heard the window being broken").) Once Defendants Short and Weaver broke the driver's side window, Defendant Harrelson "took out [his] duty issued asp and struck the passenger side window[,] breaking it[, and] then attempted to open the passenger side door from the inside so that [he] could assist De[fendant] Short and De[fendant] Weaver place the driver under arrest." (<u>Id.</u> at 4.) Defendants Short and Weaver then pulled Plaintiff out of the car through the broken driver's side window (<u>see</u> <u>id.</u>) with the assistance of Defendant Gabby (<u>see</u> <u>id.</u> at 3 (Defendant Gabby indicating that "[he] assisted [Defendant] Short and De[fendant] Weaver in removing the driver by pulling her out of

7

the window"); see also Docket Entry 31-1 at 37 (Plaintiff stating that an officer "grabbed me out by my hair and my arm . . . [a]nd just pulled me")).  "As [Defendant Harrelson] was entering the vehicle through the passenger side window, [Defendants Short, Weaver, and Gabby] already had [Plaintiff] through the window and out of the vehicle."  (Docket Entry 23-2 at 4.)  Defendants Short, Weaver, and Gabby then "placed [Plaintiff] face down on the roadway to effect an arrest."  (Id. at 3.)  By the time Defendant Harrelson "came around the vehicle[, Defendants Short, Weaver, and Gabby] had [Plaintiff] in handcuffs of [sic] the ground."  (Id. at 4.)

As Defendants Short, Weaver, Gabby, and Harrelson arrested Plaintiff, two other officers arrived on the scene.  (See id. at 7, 8.)  Defendant Cox "arrived at the scene as [Plaintiff] was being apprehended" (id. at 7), and then assisted in a search of the vehicle (see id.).  Defendant Slafky, upon arriving on the scene, "observed that the sole occupant of the vehicle had been taken into [custody]."  (Id. at 8.)  No record evidence reflects the presence of any other officer at the scene of Plaintiff's arrest.

Following Plaintiff's arrest, "De[fendant] Short took [Plaintiff] with him to his vehicle" (id. at 4) and then "transported [Plaintiff] to the Randolph County Jail" (id. at 3), where Plaintiff received charges for (1) fleeing or eluding arrest, (2) operating a vehicle with no insurance, and (3) failing to display a registration plate on her vehicle (see Docket Entry 31-1

8

at 12-13; see also Docket Entry 33-5 at 1-2 (copy of charges)). At the jail, Plaintiff had a cut on her knee (see Docket Entry 31-1 at 39, 58), but the record does not reflect that Plaintiff requested medical attention while in custody (see generally id.). Plaintiff then secured her release on bond (see id. at 48), and several days later went to the hospital to address injuries stemming from her arrest (see Docket Entry 31-1 at 60-62 (hospital records reflecting visit on March 4, 2019); see also Docket Entry 12 at 22 (attorney argument suggesting that "Plaintiff went to the emergency room as soon as she could"). Plaintiff received "a band-aid" (Docket Entry 31-1 at 50) for her knee, and possibly "Ibuprofen and muscle relaxers" (id.). X-Rays indicated no fracture or structural damage to Plaintiff's knee. (See id. at 58; see also id. (Plaintiff testifying that Defendants "didn't fracture my leg and they didn't dislocate it, but they put a big a[--] sore on there").) Ultimately, state prosecutors voluntarily dismissed all the charges against Plaintiff. (See Docket Entry 33-5 at 1-2.)

## II. LEGAL BACKGROUND

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The movant bears the burden of establishing the absence of such dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In analyzing a summary judgment motion, the Court "draw[s] all reasonable inferences in favor of the non-moving party.  Emmons v. City of Chesapeake, 982 F.3d 245, 250 (4th Cir. 2020).  However, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)).  Rather, the Court must "find that a reasonable jury could return a verdict for [the nonmoving party in order for] a genuine factual dispute [to] exist[] . . . ." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

### B. Arrests

"The Fourth Amendment protects 'against unreasonable searches and seizures' of (among other things) the person." Virginia v. Moore, 553 U.S. 164, 168 (2008) (citing U.S. CONST. amend. IV).  "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause."  Maryland v. Pringle, 540 U.S. 366, 370 (2003).  "[T]he probable cause standard . . . is a practical, nontechnical conception," Illinois v. Gates, 462 U.S. 213, 231 (1983) (internal quotation mark omitted), satisfied by an officer's observations of

10

a traffic offense, see United States v. Williams, 740 F.3d 308, 312 (4th Cir. 2014).

Consistent with the Fourth Amendment, North Carolina law permits an officer to arrest "any person who the officer has probable cause to believe (1) has committed a criminal offense in the officer's presence, or (2) has committed a felony." State v. Hardy, 31 N.C. App. 67, 69 (1976); see also N.C. Gen. Stat. § 15A-401(b)(1) ("An officer may arrest without a warrant any person who the officer has probable cause to believe has committed a criminal offense . . . in the officer's presence."). "[D]riv[ing] a vehicle on a highway, . . . when the vehicle . . . does not display a current registration plate[,] . . . is a Class 3 misdemeanor." N.C. Gen. Stat. § 20-111(1).

## C. Use of Force

An arrest made through the use of excessive force constitutes an unreasonable seizure and therefore violates the Fourth Amendment. See Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015). Courts use an objective reasonableness standard to determine whether "law enforcement officials used excessive force in the course of making an arrest." Graham v. Connor, 490 U.S. 386, 388 (1989). In that regard, the inquiry ignores the mental state of officers involved, and focuses instead on "whether a reasonable officer in the same circumstances would have concluded that a

11

threat existed justifying the particular use of force." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996).

In assessing objective reasonableness, a court should view the use of force "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Smith, 781 F.3d at 101-02 (internal quotation marks omitted) (reiterating rejection of "argu[ment] that [courts] should take a 'segmented view of the sequence of events' and hold that each step taken by the officer was reasonable based on [the plaintiff's] immediately preceding actions"). Relevant circumstances "includ[e] the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Notably, "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." Harris v. Pittman, 927 F.3d 266, 274 (4th Cir. 2019) (internal quotation marks omitted); see also Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").

### D. Duty to Intervene

"Although personal liability [under Section 1983] premised on an omission is a disfavored concept, it is well-established that an

omission to act, when coupled with a duty to act, may provide a basis for liability." Randall v. Prince George's Cnty., Md., 302 F.3d 188, 203 (4th Cir. 2002). "Under the Fourth Amendment, bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." Gunsay v. Mozayeni, 695 F. App'x 696, 702 (4th Cir. 2017). "To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act." Stevenson v. City of Seat Pleasant, Md., 743 F.3d 411, 417 (4th Cir. 2014) (internal brackets and quotation mark omitted). Officers will not face bystander liability where they do not observe the use of force, or when they arrive after other officers have arrested an individual with allegedly excessive force. See Thomas v. Holly, 533 F. App'x 208, 221 (4th Cir. 2013).

### E. Medical Care

The Due Process Clause of the Fourteenth Amendment may require police officers "to provide medical care to persons . . . who have been injured while being apprehended by the police." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). "While the precise scope of this obligation is unclear, [the United States Court of Appeals for the Fourth Circuit has] held that a pretrial detainee makes out a due process violation if he shows

13

deliberate indifference to serious medical needs." Martin v. Gentile, 849 F.2d 863, 871 (4th Cir. 1988). Put another way, "[i]n order to establish a claim of deliberate indifference to medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). A medical need qualifies as serious if it "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks omitted).

A defendant displays deliberate indifference when he possesses knowledge of the risk of harm to the detainee and knows that "his actions were insufficient to mitigate the risk of harm to the [detainee] arising from h[er] medical needs." Id. (emphasis and internal quotation marks omitted). "Th[is] subjective component . . . sets a particularly high bar to recovery." Id. In that regard, "deliberate indifference entails something more than mere negligence, . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted).

14

## F. Duty to Train

Local government bodies, such as a Sheriff's Office, may face Section 1983 liability where their "official policy[] inflicts [constitutional] injury." Monell v. Department of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). "A policy or custom for which a [government body] may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (internal brackets and quotation marks omitted).

"[T]he inadequacy of police training may serve as the basis for [Section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). As mentioned previously, "[d]eliberate indifference is a very high standard — a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695. Moreover, a Section 1983 claim predicated on a failure to train entails an exacting causation requirement: a plaintiff "must [] prove that the deficiency in training actually caused the

15

[constitutional injury]." <u>Harris</u>, 489 U.S. at 391; <u>see also</u> <u>Board</u> <u>of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown</u>, 520 U.S. 397, 405 (1997) (holding that "[w]here a plaintiff claims that the [government body] has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee"). In short, pointing to an "isolated incident[] of unconstitutional conduct by subordinate employees [does] not suffic[e]." <u>Lytle</u>, 326 F.3d at 473.

As for hiring, "a [Section] 1983 claim of municipal liability based on a hiring or retention decision survives summary judgment only upon evidence from which a jury could reasonably conclude that the final decisionmaker did know or should have known that hiring a particular officer posed an obvious risk of a particular constitutional wrong." <u>Arrington v. Jenkins</u>, Civ. Action No. 04-2274, 2005 WL 8157966, at *5 (N.D. Ala. May 19, 2005). To that point, evidence as to an office's general hiring practices, or the hiring of individuals not involved in the alleged underlying constitutional tort, bears no analytical significance because of the requirement of "a strong connection between the background of the particular applicant and the specific violation alleged." <u>Parker v. Blackwell</u>, 23 F.4th 517, 523 (5th Cir. 2022); <u>see also</u> <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 796-97 (5th Cir. 1998)

16

(recognizing hiring claim as single incident case and ignoring allegations of general deficiencies in city's police hiring policies). "It is much harder for a Monell plaintiff to succeed on a hiring claim than a failure to train claim . . . because it is especially difficult, with a hiring claim, to find both causation (that the hiring decision caused the constitutional deprivation of the plaintiff in a particularized sense) and fault (that the hiring decision reflected deliberate indifference to the particular constitutional right at issue of the plaintiff)." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 30 (1st Cir. 2005). Importantly, courts may not ignore the high standards for causation and culpability because otherwise, "a claim of municipal liability rest[ing] on a single decision, not itself representing a violation of federal law and not directing such a violation, [would create] the danger that a municipality will be held liable without fault." Brown, 520 U.S. at 408.

### G. Liability Under Section 1983

"A state official can be liable in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity." King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016). As relevant here, for personal liability, the plaintiff must "show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985). "As a general

Case 1:21-cv-00906-LPA   Document 35   Filed 04/25/23   Page 17 of 68

matter, a [state actor] may incur [Section] 1983 liability only through affirmative misconduct." Randall, 302 F.3d at 202 (quoting Parratt v. Taylor, 451 U.S. 527, 535-36 (1981)). "[Section] 1983 must be 'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)). Accordingly, "it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (quoting Vinnedge, 550 F.2d at 928).

"Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent." Graham, 473 U.S. at 165 (internal quotation marks omitted). "To state a[n official-capacity] cause of action . . . a [S]ection 1983 plaintiff must plead (1) the existence of an official policy or custom; (2) that the policy or custom is fairly attributable to the municipality; and (3) that the policy or custom proximately caused the deprivation of a constitutional right." Pettiford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008).

18

## III. DISCUSSION

### A. Unlawful Arrest

The Amended Complaint contends Defendants Short, Weaver, Harrelson, Gabby, Slafky, Cox, Shawver, Doe A, and Doe B subjected Plaintiff to an unlawful arrest. (See Docket Entry 23-1 at 21.) Plaintiff seeks to hold the foregoing Defendants liable in both their official and individual capacities (see id. at 1), with the exception of Defendant Weaver, against whom this action proceeds in only his official capacity (see Text Order dated July 28, 2022 (dismissing claims against Defendant Weaver in his individual capacity)). The Supporting Memorandum first contends that the official capacity claims "are redundant of the claims against [Defendant and] Sheriff Seabolt." (Docket Entry 31 at 6.) The Supporting Memorandum further states that the individual capacity claims should fail because the Amended Complaint does not identify which Defendants "contributed to [the] alleged harm" (id. at 7), and instead "is replete with allegations that only the 'Defendant(s)' — amorphously and without specificity — engaged in the various conduct she alleges" (id.). Defendants continue by arguing that, even if Plaintiff sufficiently identified the officers involved in her arrest, the arrest "was legally justified." (Id. at 12.) Finally, the Supporting Memorandum concludes by asserting that, even absent a legal justification for

19

the arrest, "Defendants are entitled to qualified immunity." (<u>Id.</u> at 20.)

*Official Capacity Claims*

As explained previously, an official capacity claim requires a showing of an official policy or custom, fairly attributable to the relevant government unit, that "proximately caused the deprivation of a constitutional right." <u>Pettiford</u>, 556 F. Supp. 2d at 53. Plaintiff has not presented evidence sufficient to indicate the existence of a policy allowing for unlawful arrests, arguing only in the Response that Defendant Seabolt, in his deposition, stated that he "do[es]n't like to use the word probable cause [in the traffic stop context]. [He] like[s] to use articulable suspicion." (Docket Entry 33 at 15; <u>see also</u> Docket Entry 33-3 at 7 (deposition transcript).)

This statement, standing alone, falls short as to these Defendants for three reasons. First, a reasonable articulable suspicion accurately describes the legal standard to justify a traffic stop. <u>See</u> <u>Arizona v. Johnson</u>, 555 U.S. 323, 326–27 (2009). Second, Defendant Seabolt's statement as it relates to traffic stops sheds little light on his department's standards for custodial arrests, and therefore does not establish department policy for arrests. <u>See</u> <u>Lytle</u>, 326 F.3d at 471. And third, even if the Court assumed that Plaintiff's evidence could demonstrate the existence of a department policy allowing unlawful arrests,

Case 1:21-cv-00906-LPA   Document 35   Filed 04/25/23   Page 20 of 68

such a demonstration would render this official capacity claim redundant of Plaintiff's failure to train claim against Defendant Seabolt. <u>See generally</u> <u>Love-Lane v. Martin</u>, 355 F.3d 766, 783 (4th Cir. 2004). Accordingly, the Court will grant the Summary Judgment Motion as it relates to Plaintiff's claim for an unlawful arrest against Defendants Short, Weaver, Harrelson, Gabby, Slafky, Cox, Shawver, Doe A, and Doe B in their official capacities.

*Individual Capacity*

Defendants have also demonstrated the absence of a genuine issue of material fact as to the constitutionality of Plaintiff's arrest. The Fourth Amendment, and North Carolina law, permit warrantless arrests of individuals who commit misdemeanors in the presence of law enforcement officers. <u>See</u> <u>Pringle</u>, 540 U.S. at 370; N.C. Gen. Stat. § 15A-401(b)(1). Here, the record reflects that Plaintiff, on the evening of February 28, 2019, drove her vehicle without a license plate (<u>see</u> Docket Entry 31-1 at 13-14, 29), in violation of N.C. Gen. Stat. § 20-111(1), a misdemeanor. Defendant Short observed Plaintiff operating her vehicle without a registration plate (<u>see</u> Docket Entry 23-2 at 5), and (as detailed in the Factual Background section) initiated a traffic stop, which ultimately concluded with Plaintiff's arrest. An officer's observation of a traffic violation establishes probable cause. <u>See</u> <u>Williams</u>, 740 F.3d at 312. Probable cause therefore supported Plaintiff's arrest for failure to display a registration plate,

rendering the ensuing arrest constitutional.  See State v. Gray, 55 N.C. App. 568, 571 (1982) (affirming legality of arrest where officer "lawfully detained defendant and observed that defendant's temporary license tags had been expired for over a month . . . [because the officer] thereupon had reasonable grounds to believe that defendant was committing an offense in his presence [and that therefore the] arrest of defendant [] was proper").

In the Response, Plaintiff confuses an unlawful arrest with the unlawful use of force to effect that arrest, disputing that Defendants "had probable cause to bash Plaintiff's windows of her vehicle, rip Plaintiff through the broken glass, through Plaintiff's seatbelt by her hair, throw her body on the ground, and transport her to the detention center."  (Docket Entry 33 at 9.) The means by which Defendants arrested Plaintiff may support a claim for excessive force, but do not bear relevance on the constitutionality of the underlying arrest.  Plaintiff further suggests that "the more scandalous of issues of material fact . . . when it comes to probable cause is, was the stop of Plaintiff a mistaken identity, and did the Defendants hold probable cause to stop a different vehicle that was not Plaintiff but stopped the wrong vehicle?"  (Id.)  Plaintiff supports this theory with no evidence (see id.), and "[u]nsupported speculation is not sufficient to defeat a summary judgment motion," Felty, 818 F.2d at 1128.  Accordingly, the Court will grant the Summary Judgment

Motion as it relates to Plaintiff's claim for an unlawful arrest against Defendants Short, Harrelson, Gabby, Slafky, Cox, Shawver, Doe A, and Doe B in their individual capacities.[4]

## B. Excessive Force

The Amended Complaint further contends that Defendants Short, Weaver, Harrelson, and Gabby used excessive force to arrest Plaintiff. (See Docket Entry 23-1 at 22-25.) Plaintiff seeks to hold these Defendants liable in both their official and individual capacities (see id. at 1), with the exception of Defendant Weaver, against whom the Amended Complaint asserts a claim in only his official capacity (see Text Order dated July 28, 2022). The Supporting Memorandum again argues that the official capacity claims "are redundant of the claims against [Defendant and] Sheriff Seabolt" (Docket Entry 31 at 6), and that the individual capacity claims should fail because the Amended Complaint does not sufficiently identify which Defendants "contributed to [the] alleged harm" (id. at 7). The Supporting Memorandum additionally

---

4 Because, "[f]or fourth-amendment purposes, an arrest on multiple charges is a single transaction," Wilkerson v. Hester, 114 F. Supp. 2d 446, 456 (W.D.N.C. 2000), the task for a reviewing court consists merely of determining "that there was probable cause to arrest for at least one charge," Johnson v. City of Greenville, No. 4:15-CV-00064, 2015 WL 7854564, at *7 (E.D.N.C. Dec. 3, 2015). Therefore, because the Court concludes probable cause supported Plaintiff's arrest for failure to display a registration plate, it need not decide whether probable cause supported her arrest for fleeing and eluding Defendant Short. Likewise, because the Court concludes Plaintiff's arrest did not violate the Fourth Amendment, it need not reach Defendants' arguments as to qualified immunity.

23

contends that, given the totality of the circumstances, Defendants employed reasonable force in conducting the arrest of Plaintiff. (See id. at 13-14.)  Finally, the Supporting Memorandum maintains that "Defendants are entitled to qualified immunity." (Id. at 20.)

*Official Capacity*

Just as with Plaintiff's official capacity unlawful arrest claim, Plaintiff's official capacity claim for excessive force falls short because the record does not contain evidence sufficient for a reasonable fact-finder to identify the existence of an official policy or widespread practice encouraging or sanctioning the use of excessive force.  Reference to an individual instance of alleged misconduct does not suffice because official capacity claims require a showing that an official acted pursuant to official policy.  See Collins v. City of Harker Heights, Tex., 503 U.S. 115, 122 (1992) (instructing that courts consider "whether execution of a municipal policy inflicted the injury [] because, unlike ordinary tort litigation, the doctrine of respondeat superior [i]s inapplicable").  Plaintiff has presented no evidence of an official policy or practice, and thus necessarily has failed to establish that any "official policy[] inflict[ed constitutional] injury." Monell, 436 U.S. at 694.  Consequently, Defendants have shown entitlement to judgment as a matter of law, and the Court will grant the Summary Judgment Motion as it relates to Plaintiff's

24

claim for excessive force against Defendants Short, Weaver, Gabby, and Harrelson in their official capacities.[5]

*Individual Capacity*

On the other hand, determining whether Defendants Short, Gabby, and Harrelson used reasonable or excessive force to arrest Plaintiff involves resolving genuine issues of material fact, thereby precluding an award of summary judgment. To restate the relevant factual circumstances:

1) Defendant Short attempted a lawful traffic stop of Plaintiff (see Docket Entry 23-2 at 5);

2) Plaintiff did not pull over, but the record reflects that construction obstructed the shoulder of the highway (see Docket Entry 31-1 at 26-27);

3) Plaintiff decreased her vehicle's speed significantly, and turned on her hazard lights (see id. at 25);

4) Plaintiff drove approximately 5.7 miles before taking the McDowell Road exit, but may have missed earlier exits on the highway due to weather conditions (nighttime and rain) (see id. at 21-22);

5) Upon taking the McDowell Road exit, Plaintiff pulled over on the exit ramp (see id. at 26);

_____

5 Although Plaintiff sued Defendant Weaver for excessive force in his official capacity only, the subsequent section's analysis of Plaintiff's individual capacity excessive force claim will still include reference to Defendant Weaver's conduct, because he remains subject to a corresponding state law claim for assault and battery.

25

6) Defendants Short, Weaver, Gabby, and Harrelson approached Plaintiff's vehicle with guns drawn (see id. at 30; Docket Entry 23-2 at 3, 5);

7) Defendants Short and Gabby ordered Plaintiff to both show her hands and exit the vehicle (see Docket Entry 23-2 at 3-5);

8) Plaintiff testified under oath that she kept her hands in view of Defendants, while incident reports state she did not (see id. at 4-5; Docket Entry 31-1 at 31);

9) Plaintiff told Defendants that she could not open her car's front doors or windows, and at least one Defendant (Harrelson), if not two or more, heard her (see Docket Entry 23-2 at 4; see also Docket Entry 31-1 at 31, 34);

10) Defendant Short and Weaver thereafter broke Plaintiff's driver side window, and Defendant Harrelson broke Plaintiff's front passenger side window (see Docket Entry 23-2 at 3-4, 6);

11) Defendants Short, Weaver, and Gabby then pulled Plaintiff through the broken front driver's side window (see id. at 3; Docket Entry 31-1 at 37);

12) Defendants Short, Weaver, and Gabby subsequently put Plaintiff face down on the roadway and placed her in handcuffs (Docket Entry 23-2 at 3-4).

Defendants thus employed force three times when arresting Plaintiff: they approached her with guns drawn, see United States v. Taylor, 857 F.2d 210, 214 (4th Cir. 1988) (concluding that

26

"approaching a suspect with drawn weapons [is an] extraordinary measure[]"), broke the front windows of her vehicle, see Black v. Webster, No. 20-CV-3644, 2022 WL 169669, at *7 (D. Md. Jan. 18, 2022) (finding that smashing car window can constitute excessive force), and pulled her from the vehicle through the broken window, see Ickes v. Grassmyer, 704 F. App'x 190, 193 (3d Cir. 2017) (evaluating whether officers who pulled plaintiff through broken car window employed excessive force).

Consideration of the Graham factors demonstrates the impropriety of resolving Plaintiff's excessive force claim at the summary judgment stage. The first factor entails evaluating the severity of the crime at issue. See Graham, 490 U.S. at 396. Here, Plaintiff's failure to display a registration plate constitutes a misdemeanor under North Carolina law. See N.C. Gen. Stat. § 20-111(1). "When the offense is a minor one [such as a misdemeanor], [the Fourth Circuit] ha[s] found that the first Graham factor weighed in plaintiff's favor." Hupp v. Cook, 931 F.3d 307, 322 (4th Cir. 2019). Although officers later charged Plaintiff with fleeing and eluding, a felony, the record reflects that Plaintiff, to the extent she "fled," did so by decreasing her vehicle's speed significantly, turning on her hazard lights, and eventually pulling over on an exit ramp without incident or injury. (See Docket Entry 31-1 at 21-22, 25-26.)

27

Ultimately, because the first factor should turn on the **severity** of the crime, not its **classification** as misdemeanor or felony, see Graham, 490 U.S. at 393 (rejecting "notion that all excessive force claims brought under [Section] 1983 are governed by a single generic standard"); E.W. by & through T.W. v. Dolgos, 884 F.3d 172, 180 (4th Cir. 2018) (considering misdemeanor assault as serious because it "is an offense that can be considered violent if committed by any person"), a genuine issue of material fact exists as to the first Graham factor here, see Baker v. Viehmann, No. 8:21-CV-2851, 2023 WL 2212514, at *4 (M.D. Fla. Feb. 17, 2023) (holding that "[t]he first Graham factor does not favor either party[ where defendant] fled from law enforcement after an attempted traffic stop and sped through residential areas for several minutes before the pick-up truck was disabled"); Hunter v. Snee, No. 21-CV-402, 2022 WL 204930, at *6 (D. Md. Jan. 24, 2022) (concluding that "suspended registration may not be a severe offense, [but] fleeing from law enforcement would raise a reasonable officer's concern that a greater amount of force may be needed to effectuate the stop"); Hansen v. Dailey, No. 20-2480, 2021 WL 5493058, at *11 (D. Kan. Nov. 23, 2021) (considering felony fleeing and eluding serious offense when it involved "high-speed vehicle flight from officers and running red lights and stop signs"); Schultz v. Hall, 365 F. Supp. 2d 1218, 1227 (N.D. Fla. 2005) (noting questionable severity, for Graham purposes, because

28

"fleeing and eluding a law enforcement officer[] was a felony but it [] did not involve violence").

"The most important <u>Graham</u> factor is [the second factor,] whether the suspect posed an immediate threat to the safety of the officers or others." <u>Coles v. Eagle</u>, 704 F.3d 624, 629 (9th Cir. 2012); <u>see also</u> <u>Crockett v. Blackwood</u>, No. 1:18-CV-809, 2020 WL 1144710, at *5 (M.D.N.C. Mar. 9, 2020) (describing second factor as "undoubtedly the most important factor" (cleaned up)).  For this factor, the record contains conflicting evidence: Plaintiff testified that, after she pulled over on the McDowell Road exit and Defendants approached her with guns drawn, she kept her hands in view of Defendants at all times (<u>see</u> Docket Entry 31-1 at 31), whereas Defendant Harrelson's incident report states that Plaintiff failed to obey orders to show her hands (<u>see</u> Docket Entry 23-2 at 4-5).  Accordingly, and as the Ninth Circuit concluded in a factually similar case, "[t]here is a material factual dispute as to whether [Plaintiff's] hands were [in view] when [D]efendants shattered the car window: [Plaintiff] says yes; the officers say no.  The dispute is material because it goes to the heart of the threat that [D]efendants faced at the moment they broke the window, and its resolution rests entirely on whose version of the story a fact-finder deems more credible." <u>Coles</u>, 704 F.3d at 629.

Other than the dispute over whether Plaintiff held her hands out of view of Defendants, the record lacks other evidence that

29

Plaintiff posed an immediate threat to Defendants. Although Plaintiff failed to pull over for several miles (perhaps raising the specter of more serious criminality), she did not engage Defendant Short in a high-speed chase and eventually did pull over. The factual record on this point requires further development because, as the Fourth Circuit has instructed, "the reasonableness of force employed can turn . . . [in] only a few seconds." Harris, 927 F.3d at 274. Moreover, Defendants have not suggested that Plaintiff possessed any items she could have used as weapons. See Brown v. City of Golden Valley, 574 F.3d 491, 497 (8th Cir. 2009) (affirming denial of qualified immunity while expressing doubt as to officer's claim that "two glass tumblers at [plaintiff's] feet could be used as weapons"). Nor do the incident reports reflect that Plaintiff acted in a belligerent or hostile manner (see generally Docket Entry 23-2 at 2-8), or that Plaintiff threatened Defendants (see generally id.). Those facts distinguish this case from other cases where the use of force satisfied the Graham standard. See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (deeming reasonable officer's deployment of taser to arrest driver who "used profanity, moved around and paced in agitation, and repeatedly yelled at [the officer]").

In addition, Defendants' orders to Plaintiff to both show her hands and to exit the vehicle or roll her window down (see Docket Entry 23-2 at 3-5), in effect, required Plaintiff "to do the

impossible," Coles, 704 F.3d at 626.  Had Plaintiff attempted to open her car door or roll her window down, she would have disobeyed Defendants' other order to show her hands.  See id. at 630 (explaining that "compliance with the latter order necessarily required violating the former"); United States v. Devaugh, 422 F. Supp. 3d 104, 115-16 (D.D.C. 2019) (noting "understandable confusion" that would result from simultaneous orders to "(1) keep [] hands visible, (2) open the [car] door, and (3) open the [car] window").  In light of these contradictory commands, a jury must resolve the reasonableness of Defendants' subsequent use of force.

Further, the record contains some evidence that Defendants heard Plaintiff say she could not open her vehicle's front doors or windows. (See Docket Entry 23-2 at 5; Docket Entry 31-1 at 34-35.) Although an individual's repeated refusal to "roll down [the car] window, unlock the car door, or open the car door," Madsen v. Washington Twp. Police, No. 20-CV-2395, 2021 WL 3932056, at *6 n.5 (D.N.J. Sept. 2, 2021), could warrant police breaking the car window to access the driver of the vehicle, see id., this reasoning carries less persuasive force if the officers involved learn that the driver cannot comply with their orders to open a door or window.  In that regard, Plaintiff did not actually **refuse** to comply with Defendants' orders.  "On these facts, a reasonable jury could conclude that [Defendants] did not face such an immediate threat to their safety as to justify the extreme measure of

31

smashing a car window and dragging [Plaintiff] through it." <u>Coles</u>, 704 F.3d at 629.

Lastly, the record both contains and lacks other evidence that would bear on whether Defendants perceived an immediate threat, and consequently the reasonableness of the force they employed. For one, the record reflects that at least Defendant Harrelson holstered his gun before any of the Defendants broke Plaintiff's vehicle windows (<u>see</u> Docket Entry 23-2 at 4, 5), suggesting he did not perceive an imminent serious threat to his safety, (<u>see</u> Docket Entry 31 at 13 (acknowledging that, even as Plaintiff did not comply with orders to open her door or window, "officers holstered their weapons")). Additionally, the record contains no evidence that, after breaking Plaintiff's front driver side window, either Defendant Short or Gabby attempted to open the vehicle door from the inside prior to pulling Plaintiff through the broken window. In other cases, courts have considered police use of force reasonable where officers broke a vehicle window to access a noncompliant driver, but then unlocked or opened the car door from the inside. <u>See</u> <u>Rech v. City of Batavia</u>, No. 15-CV-6732, 2020 WL 529280, at *3, *9 (W.D.N.Y. Feb. 3, 2020). If Defendant Short and Gabby did not attempt to do so, a reasonable fact-finder could interpret that evidence as corroboration of Plaintiff's testimony that Defendants heard her state that she could not open her vehicle door or window. In sum, determining whether Defendants faced an

32

immediate threat to their safety, see Graham, 490 U.S. at 396, requires resolution of myriad factual issues, an exercise in which the Court may not engage at the summary judgment stage.

The third Graham factor, whether Plaintiff "[wa]s actively resisting arrest or attempting to evade arrest by flight," id. at 396, favors neither party, further supporting denial of the Summary Judgment Motion. Plaintiff did not obey orders to open her vehicle's door or window. (See Docket Entry 23-2 at 3-5.) "When police lawfully order a driver to exit [her] vehicle and the driver refuses, police may use reasonable force to remove the driver." Nazario v. Gutierrez, No. 2:21CV169, 2022 WL 3213538, at *11 (E.D. Va. Aug. 9, 2022). However, the record indicates that Plaintiff could not have obeyed Defendants' orders (see Docket Entry 31-1 at 31, 34), and at least one Defendant heard her communicate that she could not open the door or window (see Docket Entry 23-2 at 4). Accordingly, determining the reasonableness of Defendants' subsequent use of force involves resolution of a genuine material fact, i.e., which Defendants knew Plaintiff could not obey their commands.

As the Fourth Circuit has further recognized, acts of "minimally risky physical resistance[, such as r]efusing to enter an out-of-state officer's police car until a local officer is summoned[, does not] justify physically striking the arrestee." Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810

33

F.3d 892, 904 (4th Cir. 2016); <u>see also</u> <u>id.</u> at 901 (noting that "the level of justified force varies based on the risks posed by the resistance"). Here, to the extent Plaintiff offered resistance, that resistance took a more passive form. <u>See</u> <u>Brown</u>, 574 F.3d at 497 (passenger in car who refused commands to exit vehicle and instead called 911 and sat in vehicle "was not actively resisting arrest or attempting to flee"). The low-speed vehicle chase which preceded Plaintiff's arrest may offer some evidence of resistance and/or flight, <u>see</u> Coles, 704 F.3d at 629 (question of fact for jury on third <u>Graham</u> factor where plaintiff did not immediately pull over for officer, but instead made turn into parking lot then drove to far end of parking lot before stopping at "exit that was blocked by three-foot-high concrete barriers"), but the Fourth Circuit has counseled that courts should not take a segmented view of events, <u>see</u> <u>Smith</u>, 781 F.3d at 101-02.

Put another way, "the reasonableness of force employed can turn . . . [in] only a few seconds," <u>Harris</u>, 927 F.3d at 274, meaning that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated," <u>Waterman</u>, 393 F.3d at 481. Accordingly, the proper inquiry focuses on whether Plaintiff "[wa]s actively resisting arrest," <u>Graham</u>, 410 U.S. at 396, at the time Defendants employed force. Given the totality of the circumstances, including that Defendants used three separate types

34

of force and some time passed between the first use of force (approaching Plaintiff with guns drawn) and the other uses of force (breaking the windows and pulling Plaintiff through one of them), the third Graham factor also requires resolving material factual issues, thereby supporting denial of the Summary Judgment Motion.

None of the cases Defendants reference compel a different result. The Supporting Memorandum attempts to liken the Dalton case to this one, summarizing that case as one "where the plaintiff was involved in a vehicle chase, forced officers to set up a barricade to effectuate the stop, who approached with weapons drawn upon that stop, and broke a window to extract a driver when commands were not followed." (Docket Entry 31 at 14.) But in Dalton, the plaintiff "was a suspect in a home invasion . . . [with] multiple outstanding Virginia arrest warrants[, and the plaintiff's family said he] . . . was in possession of several shotguns and pistols and would 'shoot it out' with law enforcement." Dalton v. Liles, No. 5:19-CV-00083, 2021 WL 3493150, at *2 (W.D.N.C. Aug. 9, 2021). Plaintiff here failed to display her registration plate, lacked any record of outstanding warrants, and officers possessed no reason to consider her armed or dangerous. Further, unlike the low speed pursuit in this case, the plaintiff in Dalton "led law enforcement officers on a high-speed chase," id., struck a police vehicle with his vehicle, see id., nearly struck several other vehicles, see id., and then wrecked

35

into a creek, see id., at which point the plaintiff fled on foot, see id., stole another vehicle, see id. at *3, and then "led officers on a second high-speed chase, evading stop sticks, running stop signs, driving onto private property, and striking civilian and police vehicles," id. The fact that the police in Dalton used comparable force to that exhibited in this case, considering the egregiously dangerous conduct in Dalton, does not support the Supporting Memorandum's argument that Defendants employed reasonable force here.

The Norton case also does not assist the Court's analysis because there, in ruling on a motion to suppress evidence in a criminal case, the court briefly considered whether police used excessive force to extract a passenger from a vehicle after the driver of that vehicle led police on a high-speed "five-mile pursuit which only ended because the pickup truck's path was blocked." United States v. Norton, No. 2:19-CR-145, 2021 WL 769329, at *4 (E.D. Tenn. Feb. 18, 2021), recommendation adopted, No. 2:19-CR-145, 2021 WL 744403 (E.D. Tenn. Feb. 25, 2021). The limited excessive force analysis in Norton played no apparent role in resolving the motion to suppress; indeed, "the use of excessive force during an arrest is not a basis for suppressing evidence." United States v. Collins, 714 F.3d 540, 541 (7th Cir. 2013); see also United States v. Ramirez, 523 U.S. 65, 71 (1998) (noting that "[e]xcessive or unnecessary destruction of property in the course

Case 1:21-cv-00906-LPA   Document 35   Filed 04/25/23   Page 36 of 68

of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are ***not subject to suppression***" (emphasis added)).[6]

In sum, genuine issues of material fact abound, including as to the severity of the crime at issue, whether and to what extent Plaintiff posed an immediate threat to Defendants, and whether Plaintiff "[was] actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The Court will therefore deny the Summary Judgment Motion as it relates to Plaintiff's claim for excessive force against Defendants Short, Gabby, and Harrelson in their individual capacities.

*Qualified Immunity*

The Supporting Memorandum maintains that, even if Plaintiff could show Defendants subjected her to excessive force, "Defendants are entitled to qualified immunity" because "it was not clearly established that it was unconstitutional for officers to (1) approach Plaintiff's vehicle with duty weapons drawn, (2) holster those weapons, (3) break her window, (4) remove her

---

6 Defendants also cite Mattos v. Agarano, 661 F.3d 433 (9th Cir. 2011), but the plaintiff in that case blatantly "refused to get out of the car" and "stiffened her body and clutched the steering wheel to frustrate the officers' efforts to remove her from the car," id. at 437. Here, a genuine dispute exists as to whether Plaintiff refused to comply with Defendants' commands. Moreover, the Mattos court ultimately found that "[a] reasonable fact-finder could conclude . . . that the officers' use of force was unreasonable and therefore constitutionally excessive." Id. at 446.

37

from the vehicle, (5) take her into custody, while (6) inflicting virtually no physical injury, all after Plaintiff gave a miles-long chase and refused all commands from the highway through the stop." (Docket Entry 31 at 21-22.) Because the record contains genuine issues of material fact with regard to Defendants' use of force against Plaintiff, the Court will not adopt Defendants' segmented and sanitized recitation of the events of February 28 to make a determination as to qualified immunity at this stage of the proceedings.

Qualified immunity, in certain circumstances, "protects government officials from liability for civil damages." Danser v. Stansberry, 772 F.3d 340, 345 (4th Cir. 2014). Where an official has violated an individual's constitutional rights, qualified immunity will still shield that official from personal liability "unless the official's conduct violated a clearly established constitutional right." Pearson v. Callahan, 555 U.S. 223, 232 (2009). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on [Defendants]." Meyers v. Baltimore Cnty., Md., 713 F.3d 723, 731 (4th Cir. 2013).

Here, with one sentence and no citation to authority, Defendants have not met their burden to demonstrate entitlement to qualified immunity. Even had Defendants presented a robust argument, the record (as documented previously) reflects a number of disputed facts that directly bear on the reasonableness of the

38

force Defendants used. These disputed facts include, among others, (1) whether Plaintiff kept her hands in view of Defendants after they approached her vehicle, (2) which Defendants heard Plaintiff state that she could not open her vehicle's front doors or windows, (3) how much time passed after Plaintiff pulled over before Defendants broke the vehicle's front windows, and (4) whether Defendants first attempted to open Plaintiff's door from the inside after breaking the window.

As the Fifth Circuit concluded in a similar case (albeit one without a low-speed chase), "[a] reasonable jury could infer from [Plaintiff]'s deposition testimony that [Defendants] engaged in very little, if any, negotiation with her—and find that [t]he[y] instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle." Deville v. Marcantel, 567 F.3d 156, 168 (5th Cir. 2009) (reversing district court's entry of summary judgment to defendants on issue of qualified immunity for excessive force claim); see also Davis v. Clifford, 825 F.3d 1131, 1133 (10th Cir. 2016) (reversing grant of qualified immunity to officers who "smash[ed plaintiff's] car window, pull[ed] her through the broken window by her hair and arms, and thr[ew] her on the glass-littered pavement" after traffic stop for driving with suspended license, and noting "clearly established law that the use of disproportionate force to arrest an individual who has not committed a serious crime and who poses no threat to herself or

39

others constitutes excessive force"); Coles, 704 F.3d at 630 (finding officers not entitled to qualified immunity for excessive force claim where they broke plaintiff's car window and dragged him through it because plaintiff "was suspected of a nonviolent felony[,] did not appear armed[,] did not actively resist or evade arrest[], had no real chance of escape[,] was given conflicting orders by two officers, one of whom had a gun trained on him[, and kept his] hands [] on the steering wheel just before officers shattered the driver's side window and proceeded to drag him through it"); Bezzaz v. Moore, No. 6:21-CV-528, 2022 WL 4290709, at *8 (M.D. Fla. Sept. 16, 2022) (denying summary judgment on qualified immunity grounds where officers shattered noncompliant driver's window within 42 seconds after ordering her to step out of vehicle); Hartfelder v. New Jersey State Police, No. 16-CV-5461, 2019 WL 3072252, at *9 (D.N.J. July 15, 2019) (after concluding reasonable juror could find defendant used excessive force in breaking plaintiff's window and removing her from vehicle after traffic stop, denying summary judgment as to qualified immunity for same claim because "[t]he degree of force [d]efendant used to remove [p]laintiff from the vehicle, once he breached the window, is an issue which prevents entitlement to qualified immunity[, ] as reasonableness is the touchstone of an excessive-force analysis and therefore highly pertinent to the question of qualified immunity").

40

At bottom, "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment." Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 1998). Yet this truism offers little analytical assistance because "a broad general proposition of the law will not serve to clearly establish to a reasonable officer that his conduct was unlawful." Couden v. Duffey, 412 F. App'x 476, 482 (3d Cir. 2011). As a consequence, excessive force analysis "requires careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396.

In this case, the record presents numerous factual disputes which materially bear on the reasonableness of the force Defendants employed against Plaintiff. Thus, "[t]he disputes of fact described in this opinion preclude a finding of qualified immunity at the summary judgment stage." Hopkins v. O'Brien, No. 09-CV-6877, 2011 WL 4585233, at *8 (N.D. Ill. Sept. 30, 2011). In other words, because "the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." Pouillon v. City of Owosso, 206 F.3d 711, 715 (6th Cir. 2000); see also Deavers v. Martin, No. 2:21-CV-00423, 2022 WL 4348474, at *11 (S.D.W. Va. Sept. 19, 2022) (denying summary judgment on qualified immunity due to genuine fact issues). As the Fourth Circuit succinctly stated when considering an appeal from a denial of summary judgment as to qualified

41

immunity, "[i]f there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial." Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992). Accordingly, the Court will deny the Summary Judgment Motion as it relates to Defendants Short, Gabby, and Harrelson's entitlement to qualified immunity for Plaintiff's excessive force claim.

## C. Failure to Intervene

The Amended Complaint also alleges that Defendants Slafky, Cox, Shawver, Doe A, and Doe B, although they did not participate directly in Plaintiff's arrest, failed in their duty to intervene and should therefore face bystander liability. (Docket Entry 23-1 at 30-32.) Plaintiff seeks to hold the foregoing Defendants liable in both their official and individual capacities. (See id. at 1.) The Supporting Memorandum maintains that the official capacity claim "[is] redundant of the claims against [Defendant] Seabolt" (Docket Entry 31 at 6), and that the individual capacity claim should fail because the Amended Complaint does not sufficiently identify the Defendants involved in the "alleged harm" (id. at 7). The Supporting Memorandum states further that "[t]here is no competent, admissible evidence in the record that Defendants Slafky, Cox, and Shawver observed a constitutional violation, or that they were even present at the time of Plaintiff's extraction."

(Id. at 18.)  Finally, the Supporting Memorandum restates that the Defendants  "are entitled to qualified immunity."  (Id. at 20.)

*Official Capacity*

For largely the same reasons underlying the disposition of Plaintiff's official capacity unlawful arrest and excessive force claims, Plaintiff's claim here falls short because she has failed to present evidence from which a reasonable fact-finder could discern the existence of an official policy or widespread practice whereby officers neglect to intervene during the commission of constitutional transgressions.  Plaintiff brings to the Court's attention no instances of officers allegedly failing to intervene, other than the evening of February 28, 2019, yet "[t]he fact that an official has discretion in the performance of his official duties does not mean that those acts represent official policy." Gantt v. Whitaker, 203 F. Supp. 2d 503, 509 (M.D.N.C. 2002), aff'd, 57 F. App'x 141 (4th Cir. 2003).  Because Plaintiff has adduced no evidence of an official policy, she has failed to establish that any "official policy[] inflict[ed constitutional] injury." Monell, 436 U.S. at 694.  Consequently, Defendants have shown entitlement to judgment as a matter of law, and the Court will grant the Summary Judgment Motion as it relates to Plaintiff's claim for failure to intervene against Defendants Slafky, Cox, Shawver, Doe A, and Doe B in their official capacities.

43

*Individual Capacity*

Defendants have also demonstrated the absence of a genuine issue of material fact as to whether these Defendants failed to intervene during Plaintiff's arrest. Because "personal liability [under Section 1983] premised on an omission is a disfavored concept," Randall, 302 F.3d at 203, Plaintiff must show that Defendants "knew that a fellow officer was violating [Plaintiff's] constitutional rights[, ] had a reasonable opportunity to prevent the harm[,] and [] chose not to act," Stevenson, 743 F.3d at 417 (internal brackets and quotation mark omitted).

Here, the record reflects that Defendants Cox and Slafky "arrived at the scene as [Plaintiff] was being apprehended" (Docket Entry 23-2 at 7), and "observed that the sole occupant of the vehicle had been taken into [custody]" (id. at 8). Accordingly, although the Court has previously concluded that a genuine issue of material fact exists as to whether (1) approaching Plaintiff with guns draw, (2) breaking Plaintiff's vehicle windows, and (3) pulling Plaintiff through one of the windows constituted excessive force, the record establishes that Defendants Cox and Slafky arrived on the scene after these events occurred (see id. at 7 (Defendant Cox reporting in the past tense that "[i]t appeared [Plaintiff] *was extracted* from the vehicle" at the time he arrived, 8 (Defendant Slafky reporting in the past tense that, upon his arrival, Plaintiff "*had been taken* into custody," and that the

44

vehicle's front windows **"had been broken"** (emphasis added)). As a result, no reasonable juror could conclude that either Defendants Cox or Slafky knew of an ongoing constitutional violation or ignored a reasonable opportunity to prevent such constitutional violation. See Stevenson, 743 F.3d at 417; see also Thomas, 533 F. App'x at 221-23 (police officers who arrived on scene after use of excessive force, or did not witness use of force, could not face bystander liability because they possessed neither knowledge of constitutional violation nor opportunity to prevent said violation).

The record further contains no evidence of Defendant Shawver's presence on the scene, so no reasonable juror could impose bystander liability as to him. See Anderson, 477 U.S. at 249 (reminding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). As for the Doe Defendants, although "the Fourth Circuit has allowed lawsuits to proceed against John Doe defendants[,] . . . a John Doe defendant must be identified by the time the issues are adjudicated on their merits, [because] judgments may not be entered against unnamed defendants." Myers v. City of Charleston, No. 2:19-CV-00757, 2021 WL 925326, at *10 (S.D.W. Va. Mar. 10, 2021); see also Njoku v. Unknown Special Unit Staff, 217 F.3d 840 (table) 2000 WL 903896 at *1 (4th Cir. 2000) (vacating judgment against Doe defendants). Plaintiff's

45

post-discovery failure to identify the Doe Defendants warrants summary judgment as to her claims against them.

Plaintiff's Response contends that "the De[fendants should have] intervened [during] the transport of [Plaintiff to the detention center" (Docket Entry 33 at 14), and the Defendants should not have "aided and assisted in shutting down the exit with the knowledge that Plaintiff was not fleeing to elude" (id.). The first contention presupposes an unlawful arrest, and the record contradicts that presupposition due to Defendant Short's observation of Plaintiff driving without a registration plate on her vehicle. (See Docket Entry 23-2 at 5.) The second contention relates to the traffic stop of Plaintiff, not any use of force, and ascribes to Defendants a knowledge that finds no evidentiary support in the record. Both contentions therefore lack merit.

The Response also speculates that "[Defendant] Shawver's omission of writing a report [could be] intentional and due to the circumstances of his employment" (Docket Entry 33 at 14), implying his possible presence at the scene (see id.). However, after ample opportunity for discovery, this "[u]nsupported speculation [does] not suffic[e] to defeat [the S]ummary [J]udgment [M]otion." Felty, 818 F.2d at 1128. The Court will therefore grant the Summary Judgment Motion as it relates to Plaintiff's claim for bystander

liability against Defendants Slafky, Cox, Shawver, Doe A, and Doe B in their individual capacities.[7]

### D. Denial of Medical Care

According to the Amended Complaint, after Plaintiff's arrest, Defendants Short, Weaver, Harrelson, Gabby, Slafky, Cox, Shawver, Doe A, and Doe B denied Plaintiff medical care. (See Docket Entry 23-1 at 25-26.) The Amended Complaint seeks to hold the foregoing Defendants liable in both their official and individual capacities (see id. at 1), with the exception of Defendant Weaver, against whom Plaintiff proceeds in only his official capacity (see Text Order dated July 28, 2022). The Supporting Memorandum restates its arguments that the official capacity claim "[is] redundant of the claims against [Defendant] Seabolt" (Docket Entry 31 at 6), and that the individual capacity claim should fail because the Amended Complaint does not sufficiently identify the Defendants involved in the "alleged harm" (id. at 7). The Supporting Memorandum further argues that Plaintiff's injuries "[were neither] apparent nor serious." (Id. at 16.) Finally, the Supporting Memorandum asserts that the Defendants "are entitled to qualified immunity." (Id. at 20.)

---

7 Because of this disposition, the Court need not reach Defendants' arguments as to qualified immunity.

47

*Official Capacity*

Again, Plaintiff's official capacity claim cannot proceed because she has presented evidence only of individual acts, without any evidence to suggest the existence of a policy or widespread practice of officers failing to provide medical care to detainees. "[A]n official's discretionary acts, exercised in carrying out official duties, do not necessarily represent official policy." Perdue v. Harrison, No. 1:17CV403, 2017 WL 4804363, at *2 (M.D.N.C. Oct. 24, 2017). Because Plaintiff has identified no evidence of an official policy, she cannot establish that any "official policy[] inflict[ed the constitutional] injury [of which she complains here]." Monell, 436 U.S. at 694. As a result, Defendants have shown entitlement to judgment as a matter of law, and the Court will grant the Summary Judgment Motion as it relates to Plaintiff's claim for denial of medical care against Defendants Short, Weaver, Harrelson, Gabby, Slafky, Cox, Shawver, Doe A, and Doe B in their official capacities.

*Individual Capacity*

As explained previously, Plaintiff may "make[] out a due process violation [for denial of medical care] if [s]he shows deliberate indifference to [a] serious medical need[,]" Martin, 849 F.2d at 871, i.e., one that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," Iko, 535 F.3d at 241. Plaintiff's claim for denial of medical care

48

against the Defendants in their individual capacities fails as a matter of law because she has presented no evidence of injury beyond a cut to her knee (see Docket Entry 31-1 at 50, 58, 60-62), and a scraped knee does not constitute a serious medical need, see Martin, 849 F.2d at 871 (concluding "cut over one eye, a quarter-inch piece of glass embedded in [the plaintiff's] palm, and bruises on [the plaintiff's] shoulders and elbows" insufficient for due process claim predicated on denial of medical care).  Indeed, "it is unlikely that a cut, even one that leaves a three-inch scar, is a sufficiently serious medical condition so as to satisfy the objective element of [a denial of medical care] claim." Mullins v. Southwest Va. Reg'l Jail Auth.-Abingdon, No. 7:21-CV-00289, 2021 WL 2188242, at *2 (W.D. Va. May 28, 2021); see also Kane v. Hargis, 987 F.2d 1005, 1009 (4th Cir. 1993) (cracked teeth, cut nose, and bruised face not serious medical needs); Shelton v. Angelone, 148 F. Supp. 2d 670, 679 (W.D. Va. 2001) (concluding that three bleeding cuts on wrist and two sets of marks from stun gun did not constitute serious medical needs, even though plaintiff did not get treatment for several days and injuries left permanent scars). That Plaintiff apparently never requested medical treatment while in custody, and that she only sought treatment four days after her release on bond (see Docket Entry 31-1 at 60-62), further supports the conclusion that she suffered from no medical issue which required immediate attention after her arrest, see Brawley v.

49

Philadelphia Sheriff's Dep't, Civ. Action No. 87-6725, 1988 WL 138719, at *4 (E.D. Pa. Dec. 22, 1988) (granting summary judgment to defendants where "plaintiff submitted no medical evidence that [his] knee injury was serious enough to require medical care any sooner than [he] received it"); see also Martin, 849 F.2d at 871 (considering whether delay in treatment exacerbated injuries).

Plaintiff argues in the Response that "Defendants and Defendants['] attorneys are all male, and Plaintiff and her attorney are young small, framed females[, and that] a female[] would immediately and easily recognize the necessity for doctors' attention by the *internal damage* caused from such force by males on our bodies." (Docket Entry 33 at 12-13 (emphasis added).) This argument fails for a number of reasons. First, Plaintiff provided no evidence of internal injuries. Second, Plaintiff provided no evidence that she alerted Defendants to her need for medical treatment to address any internal injuries, and "[t]he law cannot demand that officers be mind readers [or possess x-ray vision]." Grayson, 195 F.3d at 695 (ruling officers not deliberately indifferent where individual died in police custody due in part to congestive heart failure rather than "visible external injuries"). Finally, the contention that "a female[] would immediately and easily [have] recognize[d]" Plaintiff's need for medical treatment (Docket Entry 33 at 12-13) amounts to nothing more than "attorney

50

argument that cannot prevent summary judgment," <u>DeLorme Publ'g Co.</u> <u>v. BriarTek IP, Inc.</u>, 60 F. Supp. 3d 652, 671 (E.D. Va. 2014).

In sum, the record does not support a finding that Plaintiff suffered from a serious medical need. Accordingly, no reasonable juror could conclude that Defendants displayed deliberate indifference in neglecting to provide Plaintiff with medical treatment during her short time in custody. As a result, the Court will grant the Summary Judgment Motion as it relates to Plaintiff's claim for denial of medical care against Defendants Short, Gabby, Harrelson, Slafky, Cox, Shawver, Doe A, and Doe B in their individual capacities.[8]

### E. Failure to Train/Deliberate Indifference in Hiring

The Amended Complaint seeks to impose liability on Defendant Seabolt in his official capacity based on his alleged failure to properly train officers in his department. (<u>See</u> Docket Entry 23-1 at 26-28.) As part of this claim, the Amended Complaint also contends that Defendant Seabolt displayed deliberate indifference to the rights of citizens who encounter police officers in Randolph County because he "hir[ed] deputies who ha[d] violent criminal records[ as well as] false arrest liability, and fail[ed] to terminate deputies under his supervision that [we]re arrested for driving while impaired while [under his] employ[]." (<u>Id.</u> at 28.)

---

[8] Because of this disposition, the Court need not reach Defendants' arguments as to qualified immunity.

51

The Supporting Memorandum first asserts that Defendant Seabolt "is [] entitled to sovereign immunity" (Docket Entry 31 at 8), clarifying the form of immunity as governmental immunity, not Eleventh Amendment sovereign immunity (see id. at 8-10; see also Docket Entry 34 at 2-3). The Supporting Memorandum also argues that Defendant Seabolt did not fail to train his officers, and in fact "provided additional training and continuing education opportunities above and beyond State-mandated training." (Id. at 20.) For the hiring aspect of this claim, Defendants assert in the Reply that the limited instances of allegedly deficient hiring that Plaintiff cited "fail[] to establish department-wide liability." (Docket Entry 34 at 11.) Finally, the Supporting Memorandum invokes Defendant Seabolt's entitlement to qualified immunity. (See Docket Entry 31 at 20.)

*Governmental Immunity*

As an initial matter, Defendant Seabolt's argument as to governmental immunity lacks merit because that form of immunity represents a "state law defense[]," Knibbs v. Momphard, 30 F.4th 200, 213 (4th Cir. 2022), to claims arising under state law, see Hensley on behalf of N. Carolina v. Price, 876 F.3d 573, 587 (4th Cir. 2017) (evaluating applicability of governmental immunity to "plaintiffs' N[egligent] I[nfliction of] E[motional] D[istress] and wrongful death claims" arising under North Carolina law). Plaintiff's claim for failure to train arises under Section 1983 (a

52

federal law), and Defendant Seabolt therefore cannot avail himself of governmental immunity.

*Failure to Train*

Even though governmental immunity does not shield Defendant Seabolt from Plaintiff's federal claim, the record reflects the absence of a genuine issue of material fact as to whether Defendant Seabolt failed to train officers in his department, or displayed deliberate indifference in hiring. To the first point, Defendants have produced evidence that all officers complete state-mandated basic law enforcement training, and that Defendant Seabolt implemented an additional field training program for officers, which entails "32 to 40 hours of training each year." (Docket Entry 31-1 at 67.) On top of those two programs, Defendant Seabolt started a "peer counseling program," which he views as "probably the best training that some of our members received." (Id. at 66.) Rather than fail to train officers in a manner that suggests deliberate indifference to the rights of citizens, the record demonstrates that Defendant Seabolt has implemented a robust training program for officers. Just as the Lytle Court concluded, "[t]he training provided to officers in the [Randolph County] Police Department is extensive, varied, and on-going. The officers must attend basic recruit school, receive [] field training, and attend inservice training and regular seminars on special topics. [Plaintiff] ha[s] not provided any evidence that additional

53

training would have resulted in [the officer Defendants] responding any differently [on February 28, 2019]." <u>Lytle</u>, 326 F.3d at 473–74.

Plaintiff supports her failure to train claim with two statements by Defendant Seabolt, including his previously-discussed response in his deposition that he "do[es]n't like to use the word probable cause [in the traffic stop context]. [He] like[s] to use articulable suspicion." (Docket Entry 33 at 15; <u>see also</u> Docket Entry 33-3 at 7 (deposition transcript).) This statement does not suffice to establish a constitutionally-deficient training program for several reasons, including that (1) the statement accurately reflects the law for traffic stops, (2) the statement does not aid in evaluating Defendant Seabolt's views as to the standards for custodial arrests, (3) even if Defendant Seabolt held an inaccurate view as to the standard for arrests, probable cause supported Plaintiff's arrest, and (4) Plaintiff made no showing that the statement impacted officer training.[9]

In the Amended Complaint and Response, Plaintiff quotes another statement from Defendant Seabolt in a newspaper article,

_____

9 Plaintiff's Response also quotes Defendant Seabolt for the proposition that "[he] do[es]n't do any training." (<u>Id.</u> at 16 (citing Docket Entry 33-1 at 12-13).) Neither this quote nor any statement like it appears in Defendant Seabolt's deposition transcript. (<u>See generally</u> Docket Entry 33-1.) But even if Defendant Seabolt did say that he played no personal role in officer training, such a statement would only further suggest that his own views on traffic stops bear little significance on the adequacy of officer training.

54

one Defendant Seabolt supposedly made in a state of the county address. (See Docket Entry 23-1 at 18; Docket Entry 33 at 16.) In said address, Defendant Seabolt allegedly stated that "[h]e had many deputies that were certified but had not been trained in the fundamentals of traffic stops or other patrol techniques[, presenting] a huge liability risk for [Randolph C]ounty." (Id.) This statement also does not create a triable issue on the constitutionality of the officer training program because Plaintiff purports to quote Defendant Seabolt but failed to include the source of the quote as an exhibit or otherwise point to its existence in the record.

"A party asserting that a fact [] is genuinely disputed must support the assertion by [] citing to particular parts of materials *in the record*." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Accordingly, the Court has no means by which to confirm the authenticity of the quote or the admissibility of the source containing the quote. (See Docket Entry 34 at 10 (Defendants arguing that "Plaintiff cannot utilize unauthenticated quotes from newspaper articles to create a genuine issue of material fact through inferences derived from those articles").) Plaintiff cannot avoid summary judgment in this fashion. See Turner v. City of Taylor, 412 F.3d 629, 652 (6th Cir. 2005) (affirming summary judgment in favor of defendants on plaintiff's Monell claim which Plaintiff supported with reference to newspaper article because

55

"the newspaper article was inadmissible hearsay[, ] [d]efendants have not conceded its evidentiary reliability, [and therefore] it could not create a genuine issue of material fact for trial"); <u>Adams v. Devos</u>, No. CV 3:15-3592, 2017 WL 3633744, at *4 (S.D.W. Va. Aug. 23, 2017) (denying class certification where Plaintiff quoted newspaper article to support numerosity requirement but "did not provide the article to the [c]ourt"); <u>Redmond v. Teledyne Landis Mach.</u>, No. 5:15-CV-00646, 2017 WL 2465173, at *10 (N.D.N.Y. June 7, 2017) (declining to give weight to newspaper article at summary judgment stage because even if statement in article considered admissible under hearsay exception, "the newspaper article itself is still inadmissible hearsay as it is being offered for the truth of the matter asserted"). As a result, Plaintiff has not demonstrated a genuine issue of material fact as to Defendant Seabolt's officer training program, and the Court will grant the Summary Judgment Motion as it relates to the failure to train component of Plaintiff's official capacity claim against Defendant Seabolt.

*Hiring Practices*

Nor do Defendant Seabolt's hiring practices suggest "deliberate indifference to the rights of persons with whom the police come into contact." <u>Harris</u>, 489 U.S. at 388. To support this claim, Plaintiff argued that Defendant Seabolt "hired and or employed multiple Deputies who had a history of domestic violence

56

allegations and or criminal convictions." (Docket Entry 23-1 at 19.) But, in Defendant Seabolt's deposition, counsel for Plaintiff inquired as to the backgrounds of three officers who did not take part in Plaintiff's arrest, and who do not appear as Defendants in this case. (See Docket Entry 33-3 at 12-13.) To repeat, evidence as to an office's general hiring practices, or the hiring of officers not involved in the alleged underlying constitutional tort, bears no analytical significance because Plaintiff must establish "a strong connection between the background of the particular applicant and the specific violation alleged." Parker, 23 F.4th at 523.

Plaintiff further asserts, without any evidentiary support, that Defendant Seabolt "did not terminate [a particular Defendant who] was arrested for Driving While Impaired on or around a month **after** Plaintiff's cause of action." (Docket Entry 23-1 at 28 (emphasis added); see also Docket Entry 33 at 16 (restating allegation).) This contention lacks any persuasive force not only because (1) "[u]nsupported speculation is not sufficient to defeat a summary judgment motion," Felty, 818 F.2d at 1128, but also because (even assuming the veracity of this allegation) (2) any inaction from Defendant Seabolt would have occurred subsequent to Plaintiff's arrest, and therefore would not satisfy the stringent causation standards for a Monell hiring/retention claim, see Young, 404 F.3d at 30. As a result, the Court will also grant the Summary

Judgment Motion as it relates to the hiring component of Plaintiff's official capacity claim against Defendant Seabolt.[10]

## F. State Law Torts

*Assault & Battery*

The Amended Complaint also sets forth a state law claim for assault and battery against Defendants Short, Weaver, Gabby, and Harrelson, for the same conduct underlying Plaintiff's Section 1983 excessive force claim. (See Docket Entry 23-1 at 32-34.) Plaintiff seeks to hold these Defendants liable in both their official and individual capacities (see id. at 1), with the exception of Defendant Weaver, who remains in this case only in his official capacity (see Text Order dated July 28, 2022). As an initial matter, the Supporting Memorandum states that "the Sheriff's Office[] is [] entitled to [governmental] immunity." (Docket Entry 31 at 8.) The Supporting Memorandum adds that this claim should fail because "Defendants effectuated a lawful stop and arrest, and otherwise acted reasonably." (Docket Entry 31 at 22.) Finally, the Supporting Memorandum argues that Plaintiff has not made the requisite showing "of extreme or outrageous conduct, or conduct that shocks the conscience." (Id. at 23.)

A state law tort claim against state actors in their official capacity "is in effect one against the entity." Meyer v. Walls,

---

10 Because of this disposition, the Court need not reach Defendants' argument as to qualified immunity.

58

347 N.C. 97, 111 (1997). As a result, the official capacity claim here fails because, through governmental immunity, government entities "are immune from liability for the torts of [their] officers and employees if the torts are committed while they are performing a governmental function." Clayton v. Branson, 153 N.C. App. 488, 493 (2002). Although this "[i]mmunity is waived to the extent that the municipality is indemnified by an insurance contract or a local government risk pool," id., Plaintiff here failed to allege or present any evidence that Defendants "waived sovereign immunity through the purchase of liability insurance." White v. City of Greensboro, 408 F. Supp. 3d 677, 703 (M.D.N.C. 2019). Plaintiff conceded this failure in the Response (see Docket Entry 33 at 5 (admitting that "Plaintiff did not plead [Defendant] Seabolt's purchase of insurance effectively waives immunity"), thereby waiving the argument. See Nzabandora v. Rectors & Visitors of Univ. of Virginia, 749 F. App'x 173, 176 n.3 (4th Cir. 2018). Accordingly, the Court will grant the Summary Judgment Motion as it relates to Plaintiff's assault and battery claim against Defendants Short, Weaver, Gabby, and Harrelson in their official capacities.

As for the individual capacity claim, "North Carolina law recognizes that an assault and battery by a law enforcement officer may provide the basis for a civil action for damages so long as the plaintiff can show that the force used was excessive under the circumstances." Johnson v. City of Fayetteville, 91 F. Supp. 3d

775, 815 (E.D.N.C. 2015). In that regard, a state law claim for assault and battery rises or falls with a plaintiff's Section 1983 excessive force claim when those claims involve the same alleged conduct. See Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994). When a court denies summary judgment as to the Section 1983 excessive force claim, "[t]he parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well." Id. As a result, Plaintiff's assault and battery claim shall proceed against Defendants Short, Gabby, and Harrelson in their individual capacities, and the Court will deny the Summary Judgment Motion as to that claim.

*Gross Negligence*

The Amended Complaint also sets forth a series of actions Defendant Seabolt allegedly undertook, which collectively (according to the Amended Complaint) constitute gross negligence. (See Docket Entry 23-1 at 34-35.) Because Plaintiff presses this claim against Defendant Seabolt only in his official capacity (see id. at 1), the claim fails as a matter of law for the same reason as the assault and battery claim: Plaintiff failed to allege or present any evidence that the Sheriff's Office waived its governmental immunity (see generally id. at 34-35), and conceded that failure in the Response (see Docket Entry 33 at 5). The Court will therefore grant the Summary Judgment Motion as it relates to

60

Plaintiff's gross negligence claim against Defendant Seabolt in his official capacity.

*Civil Conspiracy*

Finally, the Amended Complaint contends that Defendant Seabolt and Defendant Myers, the internal affairs liaison for the Sheriff's Office, conspired to thwart Plaintiff's attempts to file a complaint with regard to her arrest and otherwise failed to conduct an adequate internal review of the incident. (See Docket Entry 23-1 at 15-16, 36-38.) Plaintiff seeks to hold Defendant Seabolt liable for this alleged civil conspiracy in his official capacity only, and Defendant Myers liable in both his official and individual capacity. (See id. at 1.) Defendants maintain their arguments as to the official capacity claim, and further add that Defendants Seabolt and Myers, as agents of the same entity, cannot as a matter of law conspire with each other (see Docket Entry 31 at 23), as well as that Plaintiff "fail[ed] to allege an agreement between any of the Defendants to violate her civil rights, nor could one be inferred from the totality of her allegations" (id.).

Defendants have again shown entitlement to judgment as a matter of law on Plaintiff's official capacity civil conspiracy claim. To repeat, an official capacity claim "is in effect one against the entity." Meyer, 347 N.C. at 111. Because Plaintiff failed to allege or present any evidence that the Sheriff's Office waived its governmental immunity (and conceded that failure in the

61

Response (see Docket Entry 33 at 5)), the Court will grant the Summary Judgment Motion as it relates to Plaintiff's official capacity civil conspiracy claim.

As for the individual capacity claim against Defendant Myers, under North Carolina law:

> A claim for damages resulting from a conspiracy exists where there is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way, and, as a result of acts done in furtherance of, and pursuant to, the agreement, damage occurs to the plaintiff. In such a case, all of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement.

Lenzer v. Flaherty, 106 N.C. App. 496, 510-11 (1992). However, the intracorporate conspiracy doctrine "provides that, because at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself, just as an individual cannot conspire with himself." Seguro-Suarez by & through Connette v. Key Risk Ins. Co., 261 N.C. App. 200, 218 (2018); see also ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) (applying doctrine to civil conspiracy claim against corporate employees because "acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation"); Conleys Creek Ltd. P'ship v. Smoky Mountain Country Club Prop. Owners Ass'n, Inc., 255 N.C. App. 236, 250 (2017) (applying doctrine to affirm summary judgment on civil conspiracy claim against association and its members); Stanley v. Wentworth Voluntary Fire Dep't, Inc., No. 1:10CV380, 2011 WL 3665009, at *17

(M.D.N.C. Aug. 17, 2011) (summarizing recent development of intracorporate conspiracy doctrine in North Carolina case law); State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 184 N.C. App. 613, 625 (2007) (holding that intracorporate immunity "is not destroyed by suing the agent in his individual capacity"), aff'd in part, rev'd in part, 362 N.C. 431 (2008).

Defendants Seabolt and Myers, as agents of the Randolph County's Sheriff's Office, can assert as a defense the intracorporate conspiracy doctrine. In the Response, Plaintiff concedes that the intracorporate conspiracy doctrine applies, but "relies on the personal stake independent of [Defendant Seabolt's] relationship to the corporation exception." (Docket Entry 33 at 19.) Plaintiff adds that "[c]redible, admissible, and public record evidence exists as to Defendant [] Seabolt's personal financial interest . . . in the form of testimony . . . regarding the increase of Sheriff Seabolt's salary." (Id.) But Plaintiff directs the Court to no evidence in the record to support this theory, and "[a] party asserting that a fact [] is genuinely disputed must support the assertion by [] citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The Response's unsupported speculation as to what future testimony might illuminate does not suffice at this stage. See Felty, 818 F.2d at 1128. Consequently, the Court will grant the Summary

63

Judgment Motion as it relates to Plaintiff's civil conspiracy claim against Defendant Myers in his individual capacity.

### G. Punitive Damages

The Supporting Memorandum also requests summary judgment on the issue of punitive damages, asserting that "punitive damages are not available against a municipality or against a defendant in his or her official capacity." (Docket Entry 31 at 23.) The Supporting Memorandum contends further that Plaintiff cannot recover punitive damages for any of her individual capacity claims because she "cannot establish that Defendants acted maliciously, willfully, or wantonly." (Id.)

As for the availability of punitive damages in Plaintiff's official capacity claims, although Defendants accurately summarize the law, the Court will deny the Summary Judgment Motion on this point as moot because, as a result of this Order, no official capacity claims will proceed to trial. As for the individual capacity claims, "[punitive] damages are available . . . for conduct that involves reckless or callous indifference to the federally protected rights of others." Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987) (internal quotation mark omitted). The Supporting Memorandum's one, conclusory sentence regarding punitive damages does not meet Defendants' burden of showing entitlement to judgment as a matter of law under Federal Rule of Civil Procedure 56. Moreover, adjudication of Plaintiff's excessive force and

64

state law assault and battery claims require resolution of several genuine issues of material fact, including matters that bear on Defendants' culpability. Accordingly, the Court will deny the Summary Judgment Motion as it relates to the issue of punitive damages for Plaintiff's (surviving) individual capacity claims.

### H. Plaintiff's Evidentiary Objection

Just prior to the Response's conclusion, Plaintiff uses two sentences to raise one final argument, cited in its entirety below:

RULE 7.6 EVIDENTIARY OBJECTION

Motion to Strike

> Plaintiff moves to strike the deposition of Ka'lah Martin's verbal testimony, Defendants Exhibit A1, from Defendants Summary Judgment Brief in support of summary judgment, as the lawyer questioning Plaintiff could be called as a witness in support of Plaintiff's State Law Claims, and any and all testimony regarding the existence or availability of dash camera footage, as represented in Plaintiff's unredacted [A]mended Complaint. Plaintiff's counselor attempted to avoid said issue throughout this case to no avail.

(Docket Entry 33 at 20.) This argument lacks merit for several reasons.

First, Plaintiff wholly failed to develop the argument, providing no factual basis to support that one of Defendants' counsel "could be called as a witness" (id.), and citing no rule of evidence or other legal basis which would preclude the admission of deposition testimony where the counsel conducting the deposition "could be called as a witness" (id.). Simply put, "a litigant has an obligation to spell out its arguments squarely and distinctly,

65

or else forever hold its peace." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks omitted); see also Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

Further, Plaintiff's Evidentiary Objection appears intended as a motion to disqualify one of Defendants' counsel, and as such, does not comply with this Court's Local Rules. See M.D.N.C. LR 7.3(a) (requiring that "[a]ll motions . . . shall be set out in a separate pleading").[11] Finally, Plaintiff, while objecting to Defendants' use of Plaintiff's deposition testimony to support the Summary Judgment Motion, would simultaneously rely on the same deposition testimony in the Response (see Docket Entry 33 at 1, 9-10, 17-18), underscoring the logical inconsistency inherent in her Evidentiary Objection.

---

11 Even if Plaintiff had properly raised a motion to disqualify, such a motion would lack merit based on the contentions Plaintiff raises here, because "[North Carolina] Rule [of Professional Conduct] 3.7(a) only disqualifies a lawyer who is a necessary witness from acting as an advocate at the trial and does not preclude the lawyer from representing the client in pre-trial proceedings in the case." Cole v. Champion Enterprises, Inc., No. 1:05CV415, 2006 WL 8447925, at *7 (M.D.N.C. Aug. 25, 2006) (internal quotation marks omitted); see also Everbank Com. Fin., Inc. v. Hunoval L. Firm, PLLC, 266 N.C. App. 617 (table), 2019 WL 3564177 at *3 (holding that "trial court abused its discretion in extending the scope of disqualification to matters outside of trial"); Cunningham v. Sams, 161 N.C. App. 295, 299 (2003) (recognizing that, "even though an attorney may[, as a result of Rule 3.7,] be prohibited from being an advocate **during trial**, the attorney may, nevertheless, represent his client in other capacities" (emphasis added)).

In sum, Plaintiff's Evidentiary Objection provides no grounds "to strike the deposition of [Plaintiff's] verbal testimony" (id. at 20). The Court will deny the Evidentiary Objection.

## IV. CONCLUSION

Genuine issues of material fact exist as to whether Defendants Short, Gabby, and Harrelson used excessive force to arrest Plaintiff, such that Plaintiff's related federal and state claims against them in their individual capacity shall proceed to trial. These factual issues similarly preclude a grant of qualified immunity for Defendants Short, Gabby, and Harrelson on the surviving federal claim, and allow for the possibility of punitive damages on the surviving federal and state claims. In all other respects, Defendants have shown entitlement to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that the Summary Judgment Motion (Docket Entry 30) is **GRANTED IN PART,** in that:

1) Plaintiff's excessive force under Section 1983 claim shall proceed against Defendants Short, Gabby, and Harrelson in their individual capacities only;

2) Plaintiff's state law assault and battery claim shall proceed against Defendants Short, Gabby, and Harrelson in their individual capacities only;

3) punitive damages shall remain available for the surviving claims;

67

4) as to all other claims and all other Defendants, the Court will enter summary judgment against Plaintiff; and

5) Plaintiff's Evidentiary Objection is denied.

This 25th day of April, 2023.

                              /s/ L. Patrick Auld
                              **L. Patrick Auld**
                              **United States Magistrate Judge**